Mr. Chief Justice Watkins delivered the opinion of the Court. The plaintiff in error was indicted in the circuit court of Clark county for murder. The indictment was found at the September term, 1848. Upon being arraigned, he standing mute, the plea .of not guilty was entered for him in accordance with the statute, and at the same term he presented his application for a change of venue, on account of the prejudice alleged to exist against him in the minds of the people of Clark county. The application was granted, ,and the usual orders made pursuant to the statute, for the removal of the cause to the county of Hot Spring for trial. The transcript of the record was filed in the office of the clerk of the Hot Spring circuit court on the 29th January, 1849, and the cause stood for trial at the ensuing March term of that court, but the judge failing to hold that term, it was continued over by operation of law. The September term of the Hot Spring circuit court was held by the judge of the 6th judicial circuit, who had exchanged courts with the judge of the 2d circuit, to which the county of Hot Spring belonged. The judge of the 6th circuit, thus presiding, had been the attorney for the State engaged in the prosecution at the time the indictment was preferred against the accused by the grand jury of Clark county, and, for that reason, considering him incompetent to try the cause, it was ordered to be continued. At the March term, 1850, the accused obtained a continuance upon his affidavit of the absence of material witnesses on his behalf. At the September term, the accused, on Monday, the first day of the term, obtained alias attachments for his witnesses, and the calling of the cause was delayed until the Thursday following. In the afternoon of that day, the cause was called for trial, and the defendant asked a postponement until the next morning, in order to allow time for the arrival of his witnesses. This was refused, and the defendant then presented his application for continuance, on account of the absence of those witnesses, which application was overruled. On Friday morning, the defendant filed his motion to quash the venire, and set aside the panel of petit jurors returned for the trial of the-cause, for certain informalities alleged in the writ of venire fa-cias, that it did not run in the name of the State, and did not specify the cause for the trial of which the sheriff was commanded •to bring the jurors into court. Notwithstanding these defects in •the writ of venire facias were doubtless amendable, and might, if need be, be amended according to the truth of the matter, on •the application of the attorney for the State, because the misprision of the clerk in issuing the venire facias, was clearly one of those defects or imperfections in matters of form not tending to the prejudice of the defendant, and by reason of which the indictment or proceedings therein could not be impaired or in aiiy manner affected, (Rev. Stat., title Criminal Proceedings, sec. 98,) |.the court sustained the motion, quashed the venire, and set aside :the panel returned. The court then ordered the cause to be con-tamed for want of time to try it at that term. The next term of the Hot Spring circuit court was held on the 4th Monday in February, 1851, pursuant to an act of the general assembly, begun in November, 1850, changing the times for the bolding of that court. At the February term, 1851, the defendant presented his .application, setting out that he had been in prison ever since the finding of the indictment at the September term, 1848, of the Clark circuit court, and after reciting the various proceedings had in the cause, as they appeared of record, prayed to be discharged from further imprisonment and prosecution in the cause. This application was overruled, and a venire facias ordered to issue for a panel of thirty-eight panel jurors for the trial of the «ause. The defendant, on the next day, protesting that he was entitled to be discharged, filed his motion and affidavit for a continuance, because of the absence of his witnesses, none of whom, .as he represented, were in attendance in consequence of the .change made'in the time of holding the court by the act of the last General Assembly, and of which change he believed his witnesses were not apprised. The application for continuance was .overruled. When the cause was called for trial on a subsequent .day of the term, the defendant objected, because a list of the jurors summoned in the cause had not been delivered to him, and he asked that the court direct the sheriff to serve him with a list of jurors, and that he might have the time allowed by law to inspect the same. It appears, from the return of the sheriff upon the venire facias, that he had summoned a panel of thirty-eight jurors for the trial of the cause, and had delivered a list of them to the defendant more than forty-eight hours before the calling of the cause for trial. The objection of the defendant consisted in this : That, in the list furnished the defendant, was the name of William A- Ewing, who had been returned upon the venire fa-cias among the jurors embraced in the panel, by the name of Newton A. Ewing; and that one Armistead Jordan, who had been returned upon the venire, was named in the list delivered to the defendant as Armes Jordan; and that the names of certain other jurors were written out in full in the list delivered to the defendant, whose Christian names were given only by initial in the return of the sheriff to the venire. Upon the hearing of this objection, the attorney for the State announced his intention to challenge peremptory the said Newton A. Ewing and Armistead Jordan. The court overruled the objection, at the same time stating to the defendant that, upon the calling of the original panel returned by the sheriff upon the venire facias, he should not be compelled to accept or challenge peremptorily any one as a juror whose name was not upon the list delivered to him. In the course of electing the jury, one John Williams was called, who being sworn upon the voir dire, and interrogated by the court, answered that he had formed an opinion as to the guilt or innocence of the defendant from conversing with persons in that county who were strangers to him, and he did not know whether they were witnesses or not: that he had expressedjio opinion as to the guilt or innocence of the defendant, and the opinion he had formed, left no bias or prejudice on his mind for or against the prisoner. The court decided him to be a competent juror, and the State elected to accept him, and the defendant not choosing to accept him, was required to challenge him peremptorily. A like decision was made by the court as to the competency of one John Moore, who' was presented as a juror, and being sworn and interrogated'upon his voir dire stated, that he had formed and expressed an opinion as to the guilt or innocence of the defendant from rumor, and talking with persons in that county; that he was not acquainted with any of the witnesses in the cause, and did not know that any of the persons with whom he had so conversed were witnes- ,, ses; but that the opinion so formed and expressed had left no bias or prejudice on his mind for or against the prisoner. Whereupon, one Isham G. Ready being called as a juror, the defendant stated to the court that, in challenging him for cause, he would not consent to submit the trial of his competency to the-court, but claimed the benefit of triers. And thereupon the court proceeded on its own motion to cause the juror presented to be sworn on his voir dire, and being interrogated by the court, he answered that he had formed and expressed an opinion as to the-guilt or innocence of the prisoner from rumor, but it had left no bias or prejudice on his mind for or against the prisoner.- The court decided the juror to be competent, and the State elected to take him; but the defendant challenged him for cause, and insisted that his competency should be submitted to and determined by triers ; the court decided that the defendant had no right to have his competency so determined, and holding him to be competent, required the defendant to accept him or challenge him peremptorily, and so the defendant challenged him. When the jury were empanneled and sworn, on proceeding with the trial, the defendant objected to the reading of the 'indictment to the jury, it being a part of the record certified from the Clark circuit court upon the change of venue, upon the ground that it did not appear to have been found by any organized or lawful grand jury of Clark county. The court overruled the objection, and the trial proceeded. The jury found the defendant guilty of murder in the second degree, and, in accordance with their verdict, was sentenced to twenty-one years confinement in the penitentiary. The defendant filed his motion in arrest of judgment-, renewing his objection that the indictment did not appear to have been found by any legally constituted grand jury. We have stated only so much of the proceedings as may be necessary to a correct understanding of the various objections taken by the defendant, all of which were reserved by exceptions during the progress of the trial. The record contains a full statement of the evidence on the trial and the instructions of the court, but no exceptions were taken in the court below, and none are argued here as to the correctness of the verdict and judgment upon the merits. I. One of the clauses of the 11th section of the declaration of rights, is to the effect that, in criminal prosecutions by indictment or presentment, the accused has a right to a speedy public trial by an impartial jury of the country or district in which the crime shall have been committed-. This provision, and- all those of a similar character, are declaratory of the sense of the people concerning great fundamental principles designed-as limitations upon the powers of the departments of the government, in the enactment, the interpretation, and the execution of laws.- That an accused is entitled to a speedy trial, is a proposition which no one will question ; but what is a speedy trial, and what consequence will follow as sanction, where a speedy trial is denied, are questions that have to be considered with reference to the existing law, and its practical operation, in the determination of individual rights. In the case of Nixon vs. The State, (2 S. & M. 507,) upon hd-heas corpus, where the prisoner, who stood indicted for murder,claimed his discharge under a similar constitutional provision of that State, by reason of the alleged delays in bringing him to trial, the court there make the following just observations: “One who is prosecuted by indictment, has by the constitution his right -• to a speedy and impartial trial. He shall not be unnecessarily, hindered and delayed in his efforts to relieve himself from the', burthen of a charge of crime. But the constitution also declares j; that he shall not be deprived of his life or liberty, but by due's' course of law.- Delays growing out of the established mode of proceeding, which has been so established by law equally for the protection of the accused, and to accomplish- the design of the ! scheme of laws, are evils necessarily attendant upon all human ,! systems of jurisprudence. They are evils to which all may be subjected alike, and which constitute a part of the price paid for the advantages, far greater in proportion thereby derived. By a speedy trial, is then intended, a trial conducted according to fixed rules, regulations, and proceedings of law, free from vexatious, capricious, and oppressive delays, manufactured by the ministers of justice.” The discharge was refused. In that case, one of the grounds relied upon, was, that at the term at which he was indicted, the prisoner demanded his trial, but at the same :¡ time insisted upon his right to an examination of the indictment!! “at least two entire days before the trial.” This would have rendered it impossible to go into the trial until some time on Saturday, the last day of the term, as limited by statute. The court held this not to be an unreasonable delay, within the spirit oif .their constitution; because, under such circumstances, the trial '"“must necessarily have been precipitated with haste, and without that deliberation and reflection on the part of the court which is due as a right in the course of law to an accused in so solemn and awful a position.” The right of the plaintiff in error here to be discharged, will depend upon the construction to be given to the legislation on this subject. Section 179, title “Criminal Proceedings,” Digest, provides that if any person indicted for any offence and committed to prison shall not be brought to trial before the end of the second term of the court having jurisdiction of the offence, which shall be held after the finding of such indictment, he shall be discharged so far as relates to the offence for which he was committed, unless the delay shall happen on the application of the prisoner. Section 180 contains a similar provision in respect of persons indicted and held to bail, and not brought to trial atthe end of the third term. Section 181 provides that nothing in the two preceding- sections shall be so construed as to discharge any person, who may have been indicted for any criminal offence, on account of the failure of the judge to hold any term of the court, or for the want of time to try such person at any term of the court. Section 182 is as follows : “ If, when application is made for the discharge of any defendant, under either of the three preceding sections, the court shall be satisfied that there is material evidence which cannot be had, that reasonable exertions have been made to procure the same, and that there is just ground to believe that such evidence can be had at the succeeding term, the cause may be continued to the next term, and the prisoner remanded, or admitted to bail, as the case may require. Under ordinary circumstances, the State has the same right to a continuance in criminal cases, and for like causes, which the defendant has, (ib. sec. 168); and the restriction upon this right, equally applicable to both parties, is that no suit shall be twice continued for the same cause. In order to ensure, as far as it could reasonably be expected by legislation, the dispatch of the public business, besides the two regular terms of the circuit court in each year for every county, the statute makes it obligatory upon the judge of the circuit court failing to hold any regular term, to hold such court on the 8th Monday thereafter, or at such other time as the court shall appoint, in case that will conflict with any other term of his circuit. (Digest, title Courts—Circuit, sec. 5.) So he may hold, special anjourned sessions, in continuation of the regular term, (Ib., title Courts of Record, sec. 20.) So he may, in his discretion J for the trial of persons confined in jail, and upon their demand / it would doubtless be his duty, to hold a special term at any time,.' by pursuing the directions given in the statute, though, judging'^ from experience, the practical utility of such irregular called terms/, may well be doubted. ' What then, upon the question here presented, is the fair construction of the statute relied on by the plaintiff in error ? It is conceded in the argument for him, that the delay at the first term at which the indictment was found, was caused by the granting of his application for a change of venue to Hot Spring, and that the failure of the judge to hold the March term, 1849, of that court, is within one of the exceptions of the statute; and at the March term, 1850, the case was continued on the prisoner’s application. But it is contended that, at the September term, 1849, the State failed to furnish a competent judge by reason of the voluntary interchange of the judges, and that, at the September I term, 1850, the want of time to try the prisoner resulted from the¡| failure on the part of the officers of the State to have legally^ summoned a venire for the trial of the cause. Supposing these' grounds to be well taken, there were then two terms of the court at which the prisoner was not brought to trial, and not coming within any of the exceptions of the statute. But, in our opinion, from the phraseology of section 179, the unavoidable construction of it is, that, in order to entitle the accused to be discharged for such cause, there must be, on the part, of the State, a failure of three terms to bring him to trial, that is| to say, at the end of the second term which shall be held after the finding of the indictment. Under a previous section, (170, title Criminal Proceedings,) all indictments, where the defendant is in custody, or under recognizance, must be tried at the term at which they are found, unless good cause for continuance be shown by either party. It was as obligatory upon the State to be ready to try the prisoner then as at any subsequent term, and for aught that appears she was ready. Independent of the phraseology of section 179, our conclusion is strengthened by corn struing it with reference to section 170. But this opinion is not to be understood as conceding that the positions assumed for the plaintiff in error, as to the failure of the State to bring him to trial, are well taken. Conscious that they present a question of much difficulty, we proceed to notice them, not to anticipate any future case that may arise, but because the question being raised on this record, it is our duty to notice it: It is insisted, on behalf of the plaintiff in error, that the statute is imperative, and that if for any cause not coming within one of the exceptions, the prisoner, who stands indicted, be. not brought to trial for the number of terms prescribed, he must be discharged, and a literal construction of the statute would favor this interpretation. d Society, for its own safety, is equally interested in protecting I the innocent and in punishing the guilty. The sections quoted were designed to shield the innocent from oppression, but not to enable th.e guilty to escape. The discharge, if the prisoner be entitled to it, must be absolute and without day ; because, if he were liable to be again arrested, and indicted for the same of-fence, the discharge would be the means of aggravating the evil which the statute sought to remedy; and it is to be gravely considered what consequences might follow from the liberal construction claimed. Suppose, then, the judge did. not fail to hold the court, but was called away by some unavoidable casualty during the term, or that the attorney for the State should find it necessary to challenge the array and set aside the panel of jurors returned, for the fraud or favor in the sheriff, so that there would not be time at that term for another venire to be returned, and a list of jurors served upon the prisoner, or that, owing to the sparseness of the population, or the very enormity of the offence, an impartial jury of the county could not be made up at any one term, or that the judge erroneously exercised his discretion in granting a continu-anee to the State for insufficient cause, or that in the course of the trial he committed some error of law against the defendant, for which he would grant a new trial, or the conviction be reversed on appeal, or that he would be compelled on account of the illness of one of the jury, or because they would not agree, at the close of the term, to discharge them, in any such case it might be truly said that the prisoner had not been brought to trial at that term. Even upon new trial, reversal for error, or mistrial, in those cases where, according to the law, as at present understood, the judge would be authorized to discharge the jury without the consent of the prisoner, he could not be said, in the sense of being put in jeopardy, to have been brought to trial. Until some perfect scheme of law can be devised, these and’ ? other causes of delay, that can readily be supposed, attending its practical administration, can never be readily guarded against. We incline to the opinion that the intention of the law is manifested by section 182, to be that the prisoner will be entitled to his discharge where the delay of the State in bringing him to trial is for want of evidence; because that section contemplates that where the application is made, and the grounds of it are well founded, the State may have a delay of one term more, if the judge be satisfied that there is material evidence on the part of the State, which she has been unable to procure, but may procure, by another term. The judicial officers furnished by the State for the trial of all offenders, are presumed to be honest and capable. We have seen what care the State by her legislation has taken to furnish the opportunity for a speedy trial. We cannot shut our eyes to the fact, known to all who are acquainted with the administration of justice, that where the crime is of magnitude, delays diminish the chances of conviction, and with that hope are usually sought or acquisced in by the accused. And for that reason, we think the spirit of the law is, that for a prisoner to be entitled to his discharge for want of prosecution, he must have placed himself on the record in the attitude of demanding a trial, or at least of resisting postponements. The interchange of judges, which caused the first delay, was made under a general law for the dispatch of business, and for the convenience of suitors, in cases where either judge in his own circuit was disqualified. There is nothing on the record from which it might be inferred that such interchange was made with the design of depriving the prisoner of a trial at that term, and if there was, it would then remain to be enquired whether such an abuse of their high trusts which would subject those judges to impeachment, could so operate in favor of the accused as to defeat the ends of public justice. The second delay complained of, occasioned by the quashal of the venire upon the motion of the prisoner, was an error of the court in his favor, because the alleged defect in the venire was amendable, and not tending to his prejudice. The term of the court being limited by law to that week, there was not time for the prisoner to have service of a list of the jurors that might be returned upon another venire at that term. Besides, the prisoner, so far from demanding a trial, was at the same term urging his application for a continuance. According to any view we take of the statute, we think the prisoner fails to show that he was entitled to be discharged for want of prosecution. 2. We find no error in the decision of the court overruling the application for continuance, made by the prisoner at February term, 1851. Although the granting or refusing continuances is matter of discretion in the circuit court, which ought rarely to be interfered with by the appellate court, yet it is a sound legal discretion which may be abused, and because, according to the practice of this court, the error, if in the refusal of the application, is one which may be corrected in the appellate court, we cannot refuse to examine its sufficiency. It'is true that a party may have more than one continuance for the absence of different witnesses, or for the absence of the same witness, if occasioned by different causes, so as to be within the spirit of the law. This application was for the want of the same witnesses, on account of whose absence the prisoner had previously obtained a continuance. The cause assigned was the change in the term of the court by act of assembly. Under some circumstances, this might be a good cause not affected by the doctrine as to ignorance of the law. But we are bound to know the law, and the application shows that, in point of fact, this, like other laws, was promulgated immediately after its passage in the public newspapers, and was known to the prisoner’s counsel. The expression of his belief that the witnesses had not heard of it, is not sufficient to overcome the legal presumption to the contrary. When it is considered that the witnesses lived in adjoining counties, that the prisoner was entitled to compulsory process to secure their attendance, and had the right, not available to the State, of taking their depositions, the showing made does not come up to the measure of legal diligence. Waiving the consideration that the uncorroborated affidavit of a prisoner charged with a capital offence, ought to be received with caution, it appears, from the statement of the testimony placed on the record by his bill of exceptions, that, upon the trial, he proved by other witnesses every material fact which he expected to prove by those who were absent. Their testimony was desired for the purpose, as stated in the affidavit, and if admitted could only have the effect of reducing the offence to murder in the second degree. 3. The statute (sec. 154, title Grim. Proc.) provides that “a list of the jurors summoned shall be delivered to the defendant, in all cases where the offence charged is punishable with death, at least forty-eight hours before the trial, unless the defendant shall waive this right; and, in other cases, before the jury is called, if such list be requested.” The object of this provision is to give the accused an opportunity of knowing what jurors have been summoned upon the panel, so as to enable him to make objections to such as are 'not acceptable to him, and the right thus secured to him is one which the courts, against his consent, cannot disregard. It is true a fair and reasonable interpretation must be given to it, and not a strained and literal construction, which would encourage frivolous objections. Upon the facts stated in regard to this exception, the question is whether a list of the jurors was furnished to the prisoner. The only part of the exception entitled to consideration is that relating to the juror, Newton A. Ewing. His name was put down in the list furnished to the prisoner as William A. Ewing.- That list is designed to be the guide of the prisoner. If the sheriff, in his return to thej/enire, should make a mistake as to the name of any juror summoned to be of the panel, but in the list furnished the prisoner should describe such juror by his true name, the prisoner would have no cause to complain, or right to object for the variance. Because the return is under the direction of the court, and, according as the fact may be, susceptible of amendment, but without his consent a mistake, which the law would regard as prejudicial to the prisoner in the list furnished to him, can only be obviated by serving him with a new list. Upon this record, it seems to be conceded that the proper name of the juror in question was Newton A. Ewing; and the' true enquiry is, whether the variance was one calculated to deceive or mislead the prisoner. Although the variance is a material one, we may suppose that, in point of fact, the prisoner was not prejudiced by it. When the mistake was brought to the notice of the court, the utmost fairness was manifested towards him by the attorney for the State and the court. His knowledge of the variance appears to have been derived from a reference to the return of the sheriff upon the venire, and-in a subsequent portion of that return, as amended, the variance is explained.- So that upon a motion for new trial in the. court below, or if the cause came up on error from the decision of that court in overruling the motion for new trial, there are abundant authorities for refusing to disturb- the verdict. But such is not the case. The prisoner made the objection upon the calling of the cause for trial, and before the jury were empannelled. The question comes up- on a strict construction in point of law, which the prisoner did not waive by any application for new trial addressed, to the equitable discretion of the court. It is true the right of challenge is allowed to the prisoner to enable him to object to any juror, but not to select a jury from the panel returned, all of whom, in the absence of such objection, are presumed to be competent, and it matters not by what particular jurors the prisoner is tried, so they are impartial. It is true the prisoner is not entitled to the absolute attendance of the jurors returned upon the venire, or to have them called in any particular order, and the trial will not be unreasonably delayed to enforce the attendance of those of the panel who make default, their places being summarily supplied by talesmen, as where the panel is exhausted. But on the supposition that those summoned will attend, the prisoner has the right to know who they are, and to have a list of them furnished him a certain time before the trial. The law gives him this right, and if he make it appear that he has been deprived of it, we are bound to presume that he was injured by such deprivation, and there is no discretion to deny him the benefit of his legal exception. 4. The next exception in order, is that relating to the competency of jurors, andthe mode of determining a cause of challenge. On this point, we shall endeavor to state briefly our views of what would seem to be the correct practice under the statute. The two sections, relating to the matter, are as follows: “It shall be good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried; but, if it shall appear that such opinion is founded on rumor, and not such as to bias or prejudice the mind of the juror, he may be sworn. All challenges for cause, may be tried by the court on the oath of the person challenged, or by triers on other evidence, and such challenges shall be made before the juror is sworn. Rev. Stat., title Crim. Pro., sec. 161 and 162. Construing this statute with reference to the common law, we think the correct mode of proceeding under it, as to challenges' to the polls for cause, is that when a juror is presented, it is the duty of the court to enquire, first of the attorney for the State, and then of the defendant “do you accept this juror, or do you challenge him?” If challenged for cause, the party should declare for what cause or causes he so challenges him. Then the court should enquire “how will you have this challenge tried, by the court or by triers?” If by the court, the cause, if disputed, is to be tried by the court upon the oath of the person challenged, and upon no other evidence. If the party challenging shall elect to have the cause of challenge in dispute determined by triers, it is to be tried on other evidence to the exclusion of the oath of the person challenged. The fairest mode of appointing triers, would be for the court to select indifferently two of the jurors accepted by both parties, upon the panel, and until so many have been accepted, two indifferent persons are to be appointed from among the by-standers, or from the panel returned on the venire, at the pleasure of the court. By the statute, two distinctions existing at the common law between challenges to the polls for principal cause and for favor,have been abolished in form, though not in substance- — 'that though the challenge, when stated, appear to be for principal cause, it is not necessarily determinable by the court, but if the party challenging shall so elect, it may be determined by triers; and that as the statute makes provision for bills of exception in criminal cases, there seems to be no. good reason for the distinction that challenges to the polls for principal cause, when staged, become part of the record, and ought so to appear, but the party may make them so by bill of exceptions, when necessary, to explain the ground of his objection, whether for the improper admission or rejection of testimony, or any erroneous decision or instruction to the tries as to matter of law, according as the facts’may be admitted or proved. As in civil cases, questions of fact-are to be tried by the court, instead of a jury, where rfeither party demands one, and in. criminal cases, the right to a jury may be’ waived,-so in regard to these collateral issues, unless it be made to appear upon’the record that the party challenging demanded triers, the presumption-will be that’he elected to have the cause of challenge tried by the court; and, in challenges for favor, the finding of the court as to the fact whether the juror stands indifferently between the parties, is equally conclusive, as if found by triers. But the sections quoted do, in our opinion, make a material change in the common law, bearing upon the precise question raised by this assignment of errors. The practice has grown up in this State for every juror when presented, in cases of felony, to be considered as having been challenged for cause by the attorney for the State. Triers are rarely demanded, and the matter is, sub silentio, referred to the court, no cause of challenge being formally stated by either party. The juror is sworn upon his voir dire, and examined by the court, or the parties under its direction, and if any cause of challenge be made to appear upon his examination, he is set aside as incompetent. Such seems to have been the course pursued in this case as to the jurors, Williams and Moore. The record shows expressly, that those jurors were challenged by the prisoner for cause, which though not specified, we must intend, from the proceedings that followed, to have been for principal cause, that the juror had formed or expressed an opinion touching the "issue to be tried. It seems to be settled at the common law, certainly as understood and practiced in this country, that where the challenge for principal cause is not sustained by proof, the same evidence may be admissible to support a challenge to the favor; because, for example, the opinion formed by the juror might not be such as the law would recognize to be cause of principal challenge, yet the fact that he had formed any opinion might be competent evidence in connection with other circumstances before the triers, to enable them to determine whether he really stood indifferent between the parties. See Freeman vs. The People, 4 Denio 34. People vs. Mather, 4 Wend. 234. The causes that may influence the triers of a challenge to the favor are, as it were, intangible; and notwithstanding the declaration of the juror, that his opinion was hypothetical or founded on rumor, and left no bias on his ihind, the triers might conclude from other evidence and against his own testimony that he was not indifferent. But under the statute, as we have already intimated, according as the mode of trial is demanded by the party challenging, the evidence is confined to the oath of the juror, or the trial is upon other evidence to his exclusion. Because there might be cases where the State or the accused, would not be willing to trust the issue upon the oath of the juror himself; and, on the other hand, if the party challenging does not elect to make the juror his witness, it would seem that he ought not to be allowed to introduce other .evidence in order to contradict or impeach him. The section quoted was designed, in consequence of the uncertainty and conflict of the decisions upon that point, to be a statutory definition of the opinion which disqualifies a juror, and so far as an opinion is a cause of challenge, it covers the whole ground of a principal challenge, and a challenge to the favor, and the distinction between them ceases. So that, after a party challenging has elected to submit his challenge for cause to the court, if the challenge be not sustained, he may not indirectly appeal from that decision by giving the same matter in evidence before triers upon a challenge to the favor. Whether the cause of challenge be tried by the court or by triers, upon the oath of the juror or upon other evidence, the first inquiry is, whether the juror has formed or delivered an opinion on the issue, or any material fact to be tried. If he has, the presumption is that he is disqualified. This follows from the language of the statute, and at this day we need not quote authority, or argue that such ought to be the law. The ancient common law doctrine that the opinion by one of the vicinage, and founded on the statement of witnesses, does not disqualify, unless it be the result of malice or ill will, has not prevailed in this country; and because the opinion, though honestly formed, is sufficient to disqualify, it is not improper, and is no imputation .against the juror, to enquire of him touching such opinion. But the statute allows this presumption to be removed by an enquiry into the nature of the opinion so formed or expressed, as if upon challenge to the favor; and whenever the presumption arises, it devolves upon the party resisting the challenge, to remove it, and he must make it appear that such opinion is founded on rumor, and that it is not such as to bias or prejudice the mind of the juror. According to our view of the statute, it does not sufficiently appear, from the statement of the two jurors, Williams and Moore, that the opinion formed, or formed and expressed by them, was founded on rumor, and until it did so appear, their declaration, however honest and true, that it had left no bias or prejudice on their minds, could not be received against the presumption of law. If the opinion be formed or expressed, the law presumes that it is such as to bias the mind of the juror, unless it is founded on rumor. It must appear to be so, and it is not enough that the juror is uncertain, or that the court or triers may be left in doubt whether it be founded on rumor. As the nature of the opinion in the mind of the juror may often be a subtle enquiry, so the source of his information may sometimes be a difficult one. But the juror is not required to know what witnesses have been summoned in the cause, nor is that the only proper test. As a man of ordinary intelligence, he ought to be able to state whether the persons with whom he conversed, had stated as of their own knowledge any fact which may have materially conduced to the formation of such opinion. If he did not understand them as knowing what they narrated, it might safely be inferred that the opinion was founded on rumor. From the statements of the juror, Ready, upon his voir dire, he was competent; but we have thought it clear that, under the statute, the party challenging had the right to elect how he would have the cause of challenge tided. The court, therefore, erred in deciding the two first named jurors to be competent, and in refusing triers to determine as to the competency of the other one. After reserving those exceptions, the plaintiff in error challenged peremptorily all three of those jurors. The plaintiff in error complains that he was compelled, by the decisions of the court in question, to exhaust three of his peremptory challenges. The record here does not show that [the prisoner had exhausted all his peremptory challenges in the empanneling of the jury, and it seems to have been held, in the case of McGowan vs. The State, (9 Yerger 184,) under similar circumstances, that the judgment would not be reversed for an error in deciding a juror, who had been challenged for cause, to be competent, if the party af-terwards challenge him peremptorily. But in the case of The People vs. Brodine, before cited, it did appear that the prisoner had challenged but thirteen jurors peremptorily, although she might have challenged twenty, and it was argued that she was not bound to have excepted a juror erroneously decided to be competent upon her challenge for cause, but might and ought to have corrected the error by availing herself of the peremptory challenges allowed her by law for that purpose- The opinion of the court was that, in no case is the prisoner bound to resort to his right to make peremptory challenges, but he may exercise it according to his judgment or caprice. “ It is for his own exclusive consideration and decision, and the court has no right to interfere with his determination.” The question was to be considered as if she had no right of peremptory challenge, and as if the acceptance of the juror was forced upon her in consequence of the erroneous decision, and then she would stand upon the legal exception. It follows, from this reasoning, that if the party chooses to challenge the juror peremptorily when he is not obliged to do so, he, by the exercise of his own will or caprice, has undertaken to correct the supposed error of the court, and waived the benefit of the previous exception. Because, if the decision was right, the party excepting could not have been injured by it, if it was wrong he had the benefit of his exception; but if at the time in doubt whether it be right or wrong, and he prefers to take the chances for an acquittal, and so elects to rid himself of the obnoxious juror by a peremptory challenge, there is no reason for holding that he can avail himself on error of the exception. thus abandoned. And so the supreme court of New York decided in the subsequent case of Freeman vs. The People. Referring to the case in 1 Denio 310, Judge Beardsley, who delivered the opinion of the court in both cases, said, “ The prisoner was free to use his peremptory challenges as he thought proper, but, having resorted to them, they must be followed out to all their legitimate consequences. Had he omitted to make peremptory challenges, his exceptions, growing out of the various challenges for cause, would have been regularly here for revision. But he chose, by his own voluntary act, to exclude these jurors,- and thus virtually, and, as I think, effectually, wiped out all such errors, if any, as had previously occurred in regard to them.” Such, we think, is the law applicable to the case now under consider ation.- 5. The only objection to the caption of the indictment here is,that it does not, in setting forth the style and term of the court,state at what place it was holden. Such defect cannot be objected after verdict. (Dennis vs. The State, 5 Ark. 231.) But the' record does not show that the indictment was preferred by any legally constituted grand jury. It has never been the practice in: this State for the names of the persons composing the grand jury, by whom the indictment was found, to be inserted in the caption. But it has been the uniform practice of this court, on appeals and writs of error in criminal cases, to require the transcript to set forth the empanneling of the grand jury and their names. This is an independent proceeding, usually the first to take place on the opening of court, of which a separate entry is made on the record, forming no part of the record of any particular indictment, so long as the record remains in the court where it was preferred; but when the record is removed, it has been considered necessary that the transcript be prefaced with-copy of the entry of the empanneling of the grand jury at the' term when the indictment was found. It is not doubted that a party in custody and liable to indict-" ment, may challenge the array of the grand jury, before they are' sworn. So he may challenge any one of the grand inquest for cause or to the favor. And it is now settled in this State that any want of legal qualification in a grand juror, or illegality in the empanneling of the inquest, which would be sufficient to vitiate an indictment, is available by plea in abatement. (The State v. Brown, 5 Eng. 78.) On the other hand, it was decided, in Fenalty v. The State, (7 Eng. 630,) that, after pleading to the indictment and standing a trial on the merits, such objections are not available to the defendant in any form. See also Brown v. The State, 7 Eng. 100. The distinction would seem to be that the objection to a grand juror or to the array, which must be pleaded in abatement and are waived by pleading to the indictment, are such as do not appear upon the record of the court, and have to be brought to its notice by plea. The omission of the record entry of the empanneling of the' grand jury has always been supplied in this court by certiorari ex officio, even after error joined, for the purpose of affirming, where no other error appeared in the record. The necessity for such a practice has been productive of no little inconvenience without any beneficial result, unless we go to the full length of holding that objections for the want of a legally constituted grand jury, are available on error after conviction. Certainly they are not to be encouraged, if allowable at all, (King vs. Marsh, 6 Ad. & Ellis 236;) and after the fullest latitude has been allowed to the defendant to make all objections for any defect or illegality in the organization of th'e grand jury, it might be fair to presume that no such irregularity existed, or consisted only of some omission that might have been applied, if he had undertaken to avail himself of it by plea in apt time, or that, by pleading to the indictment, he elected to treat it as one not tending to his prejudice. But the practice has been adhered to because of the constitutional provision that no man shall be put to answer any criminal charge but by indictment, so that unless it appear that he was indicted by a legally constituted grand jury, the proceedings against him are unauthorized, and we could not depart from the settled practice of the court without holding that a plea to the indictment is a waiver of all objections upon as well as de hors the record in the court below to the empanneling of the grand jury, or even for the want of a grand jury. In this case, the omission may have first occurred in the traii-script sent from Clark to Hot Spring, in pursuance of the order for change of venue. A certiorari to Hot Spring would not supply the defect, and if necessary in order to affirm the judgment, the writ would go to the county of Clark where the indictment was found, and where, as in all changes of venue in criminal cases, the original record remains. And so the circuit court of Hot Spring county, acquiring jurisdiction upon and by means of the order of the Clark circuit court for the change of venue, would clearly have the authority, at any time while the cause is pending before it, and whenever the omission of the entry of the empanneling of the grand jury is brought to its notice, to send a certiorario to Clark county in order to supply it. 6. For the error of the court in deciding that the trial should proceed against the objection of the prisoner, because a list of the jurors summoned had not been delivered to him forty-eight hours before the trial, the judgment of the circuit court will have to be reversed, and we have thought it proper to consider, upon the state of case presented on this record, what disposition is now to be made of the cause and of the prisoner, who, not appearing to have obtained any stay of execution pending his writ of error in this court, we are to presume, is undergoing confinement in the penitentiary, pursuant to the sentnee. At the common law, a writ of error in criminal cases, was not demandable as a right, but only granted as a matter of favor, and issued upon the fiat of the law officer of the crown. This was certainly so in all cases of treason and felony, and though the' court might order him to allow it in misdemeanors, where improperly refused, there seems to have been no mode of controlling his discretion to refuse the writ sought to reverse a conviction of treason or felony. (1 Chit. Crim. Law 748.) Bills of exception were not allowed on trials for treason or felony, and it is questionable whether they were to be allowed in any criminal case, the better opinion being that the statute of Westminister 2, which first gave a bill of exceptions, is confined to civil proceedings, for the -very significant reason assigned, that “ if such bills were j allowed, it would be attended with great inconveniency, because (of the many frivolous exceptions that might be put in by priso- ) ners, to the delay of justice; besides, in criminal cases, the judges are of counsel with the .prisoner, and are to see that justice is done him. (1 Bacon Abr., title Bill of Exceptions. U. S. v. Gibert,2 Sumner 104.) The operation of the writ would therefore be confined to such errors as were apparent upon the record and proceedings, and would in effect be like the review of a decision overruling a motion in arrest of judgment. For the like reason that where the judgment is arrested, the accused could be indicted again and tried for the offence, so where the judgment is reversed, or held for nought by the decision upon a writ of error, the defendant will have judgment of acquittal and discharge from that prosecution, (The King vs. Bourne, 7 Ad. Ellis 68); but it is no bar to another prosecution for the same offence, for the first being erroneous,, he never was in jeopardy thereby, (4 Com. 393,) and the ends of public justice have not been satisfied either in his acquittal or conviction. (1 Chit. Cr. Law 756.) Leaving out of view the remedy by writ of error to reverse the proceedings, in outlawry and the terrible consequences, foreign to our system of jurisprudence, that followed upon the imaginary conviction of an absent offender, where the judges were moved by an innate sense of right to hold the crown to the utmost and strictest technicality in all the proceedings upon, the record, (The King vs. Wilkes, 4 Burr 2565,) it is apparent that the writ of error at the common law, thus limited in its operation to errors necessarily apparent on the record, afforded but a partial means af redress against erroneous convictions. Nor was a new trial ever granted at the common law after conviction of treason or felony ; and only in misdemeanors by the supreme courts to which the proceedings had been removed by certiorari. But if there be irregularity in the conviction, or it be not warranted by the facts, the judge will respite the sentence, to enable the defendant to apply for a pardon. If the case be one of difficulty, it is reserved for the consideration of the court in bank, upon whose recommendation a pardon from the crown, or some commutation of the sentence, usually follows as a matter of course. (1 Chit, on Crim. Law 654. 2 Russell on Crimes 726. U. S. vs. Gibert, 2 Sumn. 104.) But, at an early day in the American States, the courts, by virtue of their inherent powers for the promotion of justice and untrammeled by the com-, mon law, adopted the practice of granting new trials in all criminal cases, on the application of the prisoner, for errors or irregu-j larities occuring to his prejudice during the progress of the trial. The opinion of Parker, C.J., in Com. vs. Green, (17 Mass. 533,) and of the general court of Virginia, in Ball vs. The Commonwealth, (8 Leigh 727,) are able indications of the reason and propriety of such a practice; and on the question of power to grant new trials in cases of felony, the elaborate opinion of Story, J., in U. S. vs. Gibert, before cited, stands alone among the decisions’ in this country. The argument used by him against the power, that it was a violation of the constitutional provision having its foundation in the common law, that no man shall be twice put in jeopardy of life or limb for the same offence, has been satisfactorily answered by resting the new trial on the ground off the prisoner’s consent. The jeopardy having resulted in his con~: viction, it is rather a merciful interposition of the court than any invasion of his right to set aside the conviction upon his own application, in order to afford him the opportunity of another trial. So that on this subject the only open question at this day is, as to the extent of the power of the court to discharge the jury for any cause, without the consent of the prisoner, and put him on trial again; and where the power is conceded, whether it rests in the discretion of the court, or can only be exercised in cases of inevitable necessity. The Revised Statutes of 1839 allowed bills of exceptions and appeals and writs of error of right in all criminal cases, which, until then, in this State, and under the territorial organization, stood as at the common law. Among the provisions regulating-the proceedings on appeals and writs of error in criminal cases, are the following, (title Crim. Proceedings, sec. 236-7) : “ If the supreme court shall affirm the judgment of the circuit court, the sentence pronounced by such court shall be directed to be carried into execution, and the same shall be executed accordingly. If the judgment of the circuit court be reversed, the supreme court shall direct a new trial, or that the defendant be absolutely discharged, according to the circumstances of the case.” In the case-of The State vs. Graham, (1 Ark. 432,) the opinion of this court was deliberately expressed that the statute allowing appeals and writs of error in criminal cases, was broad and comprehensive enough in its terms to include the State as well as the defendant, and the reasons are well given at length, for their conclusion that the legislature intended to extend the right equally to the State and the accuse^. But the authority of the case, as an adjudication on this point, is weakened by the fact that the indictment had been dismissed without trial in the court below for want of jurisdiction, and that the punishment of the of-fence was a pecuniary mulct only, not affecting life or limb, so that, as the court say, the question of jeopardy could not in any event be involved. In The State vs. Hicklin, (5 Ark. 191,) where after conviction of murder, the judgment was erroneously arrested in the court below, this court, referring to The State vs. Graham, declared the decided opinion that the legislature intended to confer the right of appeal in all criminal cases or prosecutions equally upon the State and the accused, and accordingly reversed the judgment, and directed the judgment of conviction to be reinstated and carried into execution in the court below. Though the actual adjudication in this case was right, it does not touch the question of jeopardy. But in the case of The State v. Hand, (1 Eng. 169,) where the defendant was acquitted of felony, the court refused to entertain a writ of error brought by the State, because the defendant, although acquitted upon the ground oi a variance between the indictment and-proof, (Rev. Statutes, title. Crim. Proceedings, sec. 242,) yet could not be tried again on the same indictment, and no result, beyond the decision of mere abstract questions, could be attained by the reversal. This, at least, was the true ground of the decision, rather than the one assumed by the court, that the defendant, under the constitution, is shielded by the acquittal in any criminal case from all further^ prosecution for the offence with which he stood charged, and ' without noticinng the distinction adverted to in The State v. Graham, between felonies and misdemeanors. It is upon that distinction only that so much of the decision in The State v. Quarles, at January term, 1853, as remanded the cause for trial anew, is to be sustained. But, in consequence of the decision in the case of The State vs. Hand, the act of December 20, 1846, was passed, making it the duty of this court to entertain and decide appeals and writs of error on behalf of the State in all criminal cases of whatever grade, so that the questions of law may be adjudicated, notwithstanding the acquittal of the defendant in the inferior court might be a bar to any furtner trial or prosecution for the same offence. The policy of this statute was to enable the State to obtain the opinion of the supreme court upon points of law or practice, which, so long as the defendants were acquitted, might continue to be erroneously ruled in the various circuits, and without intending to impair any constitutional right of the defendant in the particular case. It seems not to have been doubted by this court in any case, that where the defendant being convicted, moved for a new trial in the court below, and upon its refusal, prosecuted his appeal or writ oí error, if the judgment be reversed by this court, the cause will be lj remanded for new trial, the refusal to grant which was the spe-1 cific error complained of. But, apart from the case of Patterson vs. The State, (2 Eng. 59,) which cannot be regarded as an authority or precedent upon the question here involved, the court is, for the first time, to consider whether the defendant, in a capital case, is to be discharged or remanded for trial anew where he prosecutes his writ of error without having moved for a new trial in the court below, and where, in our opinion, the judgment ought to be reversed. It is plain that, upon the reversal of a conviction, the prisoner ought to be discharged in all cases, where the indictment fails to set forth any offence against the law, (Stith vs. The State, at the present term,) or where the statute, under which he is indicted, is unconstitutional, (Washington vs. The State, also at this term;) and such was the effect of the reversal in Hughes vs. The State, (1 Eng. 134.) And so the defendant ought to be discharged by this court whenever the judgment is reversed by reason of any such defect of form or substance in the indictment, for which the judgment might or ought to h.ave been arrested in the court below, though in such cases, as we have seen, another indictment may be preferred, because an accused is only in jeopardy upon a good indictment. But wherever the conviction is sought to be reversed because of some error in the proceedings, of which, without the statute, the prisoner could not have availed himself by motion in arrest, and which he can only place upon the record by means of his bill of exceptions allowed by the statute, and of which he could pot have availed himself by motion for new trial at the common law, where the doctrine of jeopardy had its origin, because of any .error or irregularity in the proceedings upon a valid indictment, we must conclude that it is no violation of his constitutional right to remand the cause upon reversal to be again tried on the same indictment. If, before the passage of the statute allowing appeals and writs of error in criminal cases, the prisoner could have a new trial, and urge in support of it matters de hors the record, it would only have been done by virtue of the humane extension by the courts of this country of a power never exercised in England, and then a decision against the motion would be final without the benefit of revision by the appellate court. If the judgment was arrested, the accused might be indicted again, so if acquitted for a variance, without doing violence to the common law doctrine of jeopardy. But if an accused, by reserving his exceptions without moving for a new trial, is entitled to be discharged upon a reversal op error, for any irregularity in the proceedings, there would be no warrant in law to indict him again, and this would be extending the exemption from_being// twice put in jeopardy greatly beyond the common law, because; there the prisoner could not be relieved from such erroneous judgment by any means short of a recommendation to pardon. We can readily understand why, in England, the common law —that no man should be twice put in jeopardy, in order to be an alfectual shield and protection — must have been inflexible. Even if the exercise of executive clemency in a republic were not an indifferent as well as impolitic substitute for the mercy of the crown, it is notin accordance with the spirit of our institutions that it should be so. The words, “ once in jeopardy,” would become unmeaning, and the constitutional right growing out of it would be valueless, unless construed, in meaning and spirit, with reference to the changes in the law, affording additional guaranties to the accused, all having the same end in view, to secure to him a fair and impartial trial, and to protect him against oppression. This was the error in the opinion of Judge Story. Because, unless a party convicted could waivehis constitutional right not to be twice put in jeopardy by submitting to a new trial, the right would become an incumbrance instead of a privilege. And we think that when a party convicted upon a valid indictment avails himself of the statute to be relieved of a conviction, which he thereby alleges is erroneous or irregular, he does so on the implied condition of submitting to a new trial, whether he has applied for it in the court below or not. So far as the sta-!. tute gives to this court any controlling discretion to await a new trial in such cases, it would seem that we are bound by considerations of public policy, presuming in favor of the intention of the legislature, to adopt that construction. In England, where the necessity for strictness in criminal proceedings, has induced corresponding degree of caution and regularity, the evils that would result from an absolute discharge in all cases on reversal for error might not be seriously felt; but in this country, where the law itself has not yet become settled, and its administration is so often confided to inexperienced officers, the consequences of giving such a construction to the statute, would be disastrous and subversive of the ends of public justice. The accused would never adopt the formality of moving for a new trial, if, by standing on a multitude of exceptions, he could secure a reversal, which entitles him not merely to a discharge, but an immunity from another prosecution. The prisoner will be surrendered by the keeper of the penitentiary, upon the warrant of this court to its officer, to be by him conveyed and delivered into the custody of the sheriff of Hot Spring county, to await his trial; for which purpose, the cause will be remanded to the court below, with instructions that the same be further proceeded in according to law, and not inconsistent with this opinion.